[No. 25147. Department Two. January 9, 1935.]

YAKIMA GROCERY COMPANY, *Respondents*, v. SEATTLE
ASSOCIATION OF CREDIT MEN, *Appellant*,
H. E. VINES, *Defendant.*[1]

*Burkheimer & Burkheimer* and *Cheney & Hutcheson*,
for appellant.

*Lloyd L. Wiehl*, for respondent.

GERAGHTY, J.—This is an action of replevin to re-
cover possession of a stock of groceries contained in
a market in the city of Yakima. The market was op-
erated by H. E. Vines under the trade name of Vines
Trading Company. Vines made a common law assign-
ment for the benefit of creditors to the defendant cor-
poration, Seattle Association of Credit Men, and
shortly thereafter the plaintiff commenced its action
to repossess the stock of groceries, claiming that Vines
had possession only as its consignee. The court found
the existence of a valid consignment agreement, and
judgment was accordingly entered for the plaintiff.
This appeal follows.

[1]Reported in 39 P. (2d) 617.

The existence of a valid consignment is the issue raised by this appeal. Vines, while named as one of the defendants in the case below, made no appearance, but was called as its principal witness by the appellant. The principal witnesses for the respondent were its credit manager, Mr. Van Amburg, and its general manager, Mr. Coffin.

Vines was the principal stockholder of a corporation owning a market building in Yakima. The grocery department in this market had been operated by a tenant who had failed, and Vines was anxious to restock and continue the grocery department. He operated markets in several cities in the state, conducting his business under various names in these localities. He applied to the respondent to extend him credit for a stock of groceries for the market in Yakima. It appears that the respondent regarded his credit as questionable, and was reluctant to sell the goods on credit. An arrangement was ultimately reached under which $1,500 worth of groceries were delivered upon Vines' giving to the respondent four trade acceptances in the sum of $375 each. The first of these acceptances was payable in the week following the opening of the market, and the others at weekly intervals thereafter. The acceptances were in the following form, except as to dates:

"The West Side National Bank          No.——
                  "Yakima, Wash., May 4th, 1933.

"June 19th, 1933, pay to the order of Yakima Grocery Company, Inc. $375.00   Three Hundred Seventy Five Dollars.

"The obligation of the acceptor of this bill arises out of the purchase of goods from the drawer. Upon the acceptor hereof suspending payment, giving a chattel mortgage, suffering a fire loss, disposing of his business or failing to meet at maturity any prior trade ac-

ceptance, this trade acceptance, at the option of the holder, shall immediately become due and payable.
"Value Received, and charge same to account of
"YAKIMA GROCERY CO.
"by C. H. VAN AMBURG, Sec.
"To Vines Trading Company
Yakima, Washington.
"Accepted May 4th, 1933.
"Vines Trading Company
"by H. E. VINES
"Payable at Yakima First Nat. Bank
Yakima, Washington."
(On Back): "Payment of this Trade Acceptance guaranteed by
" H. E. VINES"

In addition to the $1,500 stock of groceries originally delivered, the respondent delivered other groceries and received three additional trade acceptances in the same form; two in the sum of $375 each, and one in the sum of $458.97; these acceptances covering the amount due for the additional groceries delivered. The four acceptances given for the first purchase were paid. The last three were unpaid at the commencement of this action.

As the groceries were delivered to the Vines Trading Company, they were accompanied by invoices on the regular forms used by the respondent, setting out in detail the prices charged for the merchandise. The invoices had, however, stamped on the face in some instances, and typewritten in others, the words: "This merchandise consigned for sale. Yakima Grocery Co., Inc." Other than this, there was no written evidence of any consignment agreement by the parties.

Vines testified that there was no consignment agreement, and that he objected to the stamping of the consignment endorsement on the invoices; but admitted that, when the matter of credit was first broached and the respondent appeared reluctant to extend credit, he

had suggested that the goods be sent on consignment. He testified that this suggestion was not acceptable to the respondent, the latter in turn suggesting the method of payment through trade acceptances.

The trial court, in announcing its conclusions, said that it disregarded the testimony of Vines and accepted that of Coffin and Van Amburg. Accepting the court's view of the credibility of these witnesses, we still find ourselves unable to arrive at its conclusions. Van Amburg, respondent's credit manager, testified:

"After an hour or so of argument back and forth he suggested he would be able to pay us back in a very short time, and we agreed only on a consignment arrangement to let him have any goods at all. Then in order to have the matter scheduled and that we might be able to depend upon a certain repayment, we worked out together with him the plan of paying us $375 a week, to commence one week later, and that would clean the whole matter up in four weeks. We wanted trade acceptances simply because it seemed the logical way to get the matter in hand and have the payments under certainty and with Mr. Vines out of town most of the time, the trade acceptances could be deposited in the bank and charged to his account without further preliminaries. There was much conversation before we agreed to it at all, because we tried to avoid the proposition entirely. . . .

"Nothing was said in any of these conversations about our exercising any control at all over the conduct of the business of Mr. Vines. No specific remarks were made, and we never at any time either exercised or attempted to exercise any control at all over the conduct of his business. I don't know whether the insurance policy was with loss payable to us or not. We did not pay any salaries of employes or rent or taxes or attempt to exercise any control at all over it. Nothing was said at all as to the price at which the goods should be resold by Mr. Vines. We did not dictate his selling price. He could re-sell for any price he pleased, and whatever profit he made was his profit. Nothing

was said about the title to the proceeds of the sale or the money he took in from the sale of groceries, as to whose money that would be. Only when we found he was in distress we tried to get our money; that was the only time anything was said about the proceeds of the goods."

The testimony of Coffin, the general manager, was in essentials to the same effect as that of Van Amburg. When repeatedly pressed by counsel to state what was agreed with respect to accounting for the proceeds of the sale, inventories, prices, right to take the merchandise back, and other incidents usual in a consignment contract, they answered by the statement that the agreement was all implied in the consignment and acceptances. They used the word *consignment* as a symbol implying all that was necessary by way of contract in the circumstances.

"There is no particular magic in the term 'consigned' or 'consigned account.' In a sense all goods shipped to another are consigned to him. The question is what was the inherent character of the transaction, which depends upon the purpose of it. Were the goods put in the hands of the one party by the other, to be sold for him and on his account, creating the relation of principal and factor; or were they turned over to such party, to be treated and disposed of as his own, being responsible to the other simply for the price? In the one case we have a trust or bailment, the goods throughout being those of the consignor or principal, as well as the moneys received for them. In the other there is a sale; the superadded condition, sometimes appearing, that the title shall not pass until the goods are paid for, amounting to nothing as a restriction upon it." *In re Wells,* 140 Fed. 752.

The respondent delivered to Vines a stock of miscellaneous groceries to be put upon his shelves for resale to the public at prices to be determined by himself. The respondent reserved no form of control over the business. Vines might sell for cash or upon

credit. He was not required to make any specific accounting of his sales, nor is it established that there was any inventory taken from time to time. The whole obligation of Vines was represented by the acceptances, which bound him at all events to pay the stipulated sums upon the agreed dates. There was no agreement that the respondent could retake the merchandise, and, in fact, after Vines defaulted in his payments, no effort was made to retake it until this action was started after the assignment. It appears from the evidence that, after the default of Vines, the respondent left him in possession of the groceries already delivered, requiring only that he thereafter pay cash upon delivery for any further merchandise. It appears in the record, too, that, after Vines' default in making the payments due, the respondent made telegraphic demand upon him at Seattle as follows: "Acceptances 12th and 19th unpaid. Will attach if no settlement forthcoming. Answer Thursday."

The threat of an attachment would seem to negative the suggestion that the respondent at that time considered itself the owner of the merchandise.

All the testimony given by respondent's witnesses in relation to the original agreement was vague and, as we have before said, dependent on the implications arising from the use of the word *consignment*. Considered in the light most favorable to respondent, the testimony would indicate only an initial colorable transaction, whose effect was wholly negatived by the subsequent dealings.

The force of the nebulous testimony of Van Amburg and Coffin as to the consignment agreement and the stamping of the word *consignment* on the invoices is overborne by the actual conduct and course of dealing of the parties. The stock of miscellaneous groceries was placed at the disposal of Vines, without the res-

ervation of any control in the respondent. The acceptances taken in payment were the unconditional obligations of Vines, payable in any event, and they bore on their face the statement that they were the obligation of Vines arising out of the purchase of goods from the respondent. They also carried the statement that, if Vines should suspend payment, give a chattel mortgage, suffer a fire loss, dispose of his business, or fail to meet at maturity any prior trade acceptance, they were, at the option of the holder, to become immediately due and payable. They contained no stipulation that, upon default in payment, the respondent would have the right to recover the merchandise.

"It is undoubtedly true that the form of the transaction is of little consequence if the real purpose behind it is to cover up the vendee's interest in goods that have come into his possession, and thus to enable the vendor to get an advantage over other creditors to which he is not in truth entitled. As was said by the Supreme Court of Pennsylvania in *Thompson v. Paret*, 94 Pa. 275 (and this statement was approved in *Peek v. Heim*, 127 Pa. 500, 17 Atl. 984, 14 Am. St. Rep. 865):

" 'Whatever the form of the agreement, if its purpose was to cover up a sale and preserve a lien in the vendors for the price of the goods it was void as respects creditors, whether the credit was given before or after the delivery of the goods. A consignment for such object was no better than any other device'." *In re Levin*, 127 Fed. 886 (D. C. Pa.), 11 A. B. R. 446.

"In considering this contract, the language of this court *In re Leflys*, 229 F. 695, 696, is pertinent. The court said: 'The contract under consideration is one not easy to classify. It indicates an intention to secure the advantages and avoid the disadvantages of a conditional sale. In arriving at a proper construction of it, little weight can be given to the frequent allusions therein to the claim that the relation of the parties is

that of principal and agent, as against the effect of its terms.'

"In the contract now before the court there is no provision for the segregation and marking of the goods. It is not required that the Wayside Furniture Company shall be held out as the agent of the appellant. There is no reservation of title in the proceeds and no provision against commingling of the proceeds. The Wayside Company could sell the furniture at any price and on such terms as it saw fit to do. Its only obligation was to pay to the Union Company within thirty days after sales made by second party the amount at which the furniture was invoiced. The provision that the Wayside Company shall have 'the privilege of purchasing such furniture · or any part thereof upon such terms as may be specifically agreed to by the parties thereto' is meaningless unless it is read in connection with the right of the Wayside Company to sell the furniture and convey title thereto upon payment of the invoice price within thirty days. Taking the instrument as a whole, it appears that the consignee is at liberty to sell at a price and on terms fixed by itself, being answerable to the consignor for a fixed price. The contract, in our opinion, cannot be regarded as one of consignment." *In re Wayside Furniture Co.*, 67 F. (2d) 201.

Cases cited by respondent from this and Federal courts are distinguishable on their facts from the case at bar. We may note specially *In re Bailey*, 176 Fed. 628. In that case, the court held the contract one of consignment, although the consignee subsequently gave notes for the price of goods for the accommodation of the payee. The court said:

"These notes were discounted by the Perkins Manufacturing Company in Augusta, and were renewed whenever they fell due; but the understanding between Bailey and the Perkins Manufacturing Company was that Bailey should be required to pay thereon only what moneys he derived from the sale of the goods. All the parties to the transaction say, and all of the testimony shows, that the goods were shipped upon a

consignment contract, and that the notes were not given or accepted in payment therefor.''

Clearly, this case is not in point here. It was not understood here that the acceptances were not to be paid if the groceries remained unsold. On the contrary, we find the respondent, under threat of attachment, demanding payment of the outstanding acceptances issued for groceries delivered to Vines but not resold. On the face of the record, we cannot escape the conclusion that the consignment, at most, was only colorable, and that there was, in fact, an absolute sale by the respondent.

The respondent having taken possession and disposed of the grocery stock here involved, and the parties having agreed that its value was $979.02, the judgment will be reversed, and the cause remanded with directions to enter judgment in favor of the appellants and against the respondent and the sureties upon its bond for that sum, together with costs in both courts.

BEALS, C. J., BLAKE, TOLMAN, and HOLCOMB, JJ., concur.